IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

ROBERT CURLEYHAIR
and MONICA CURLEYHAIR,

             Plaintiffs/Counter-Defendants,

   vs.                                      CIVIL NO.   03-234 JP/LFG

GRAND RAPIDS TRANSPORT, INC.
and JOHN LEE GALLOWAY,

             Defendant/Counterclaimants,

and

GRAND RAPIDS TRANSPORT, INC.,

             Third-Party Plaintiff/Counter-Defendant,

   vs.

W.W. CONSTRUCTION, INC.,

             Third-Party Defendant/Counterclaimant.

## MEMORANDUM OPINION AND ORDER
## RECOMMENDING DISMISSAL WITH PREJUDICE[1] [2]

THIS MATTER is before the Court on Defendants/Counterclaimants, Grand Rapids

Transport, Inc. and John Lee Galloway's Motion to Dismiss for False and Misleading

Statements by Plaintiffs in Discovery [Doc. 62].  The motion is fully briefed.  Plaintiffs

---

[1]Discovery matters normally come within the purview of the referred magistrate judge and are handled without the need of a formal referral.  Here, however, because dismissal is sought, the trial judge referred the motion to the Chief Magistrate for a report and recommendation [Doc. 93].

[2]Within ten (10) days after a party is served with a copy of this analysis and recommended disposition, that party may, pursuant to 28 U.S.C. § 636(b)(1), file written objections to such analysis and recommendation.  A party must file any objections within the ten-day period allowed if that party wants to have appellate review of the analysis and recommendation.  If no objections are filed, no appellate review will be allowed.

requested oral argument [Doc. 90], but the Court determines that argument is not necessary and that the motion may be resolved on the briefs.  Therefore, Plaintiffs' motion [Doc. 90] for oral argument is DENIED.

After careful consideration of the pleadings and pertinent law, the Court recommends dismissal of Plaintiffs' lawsuit.  The Court's reasoning follows.

### Background

This is a lawsuit for personal injury and damages, including punitive damages, arising out of the motor vehicle collision which occurred on September 13, 2002, in a construction area of the west-bound lane of Interstate 40 in McKinley County, New Mexico (Initial Pretrial Report, Doc. 26, p. 2).  Plaintiff Robert Curleyhair ("Curleyhair") was employed by W.W. Construction, Inc. and was driving a company vehicle to the construction work site. He alleges that Defendant John Lee Galloway ("Galloway") was negligent while driving a tractor-trailer rig owned by Grand Rapids Transport, Inc.  Curleyhair was in the process of making a U-turn from the east-bound lanes of Interstate 40 on to the west-bound lanes of the freeway when he was struck by the tractor and trailer being driven by John Lee Galloway. Curleyhair contends:

> As a direct and proximate result of Defendants' negligence, Plaintiff Robert Curleyhair suffered damages, including but not limited to, medical expenses, future medical expenses, loss of income, loss of future earnings, loss of enjoyment of life, mental anguish, emotional distress, loss of consortium, and pain and suffering, all of which may extend into the future.

(Complaint, Doc. 1, p. 3, ¶ 21).

In addition to Curleyhair's own claims for damages, his spouse, Monica Curleyhair, filed a separate claim, contending that as a result of Defendants' negligence, she too has suffered mental and emotional damages, as well as loss of consortium.  (Id., p. 3, ¶ 22).

## Discovery

During formal discovery, Defendants served various interrogatories on Curleyhair. He was asked in Interrogatory No. 5 to identify and describe "each and every accident, injury and illness you  have sustained in the past ten (10) years other than the incident referred to in your Complaint . . . ."  Defendants sought specific information or each accident, injury and illness.

In Curleyhair's response to Interrogatory No. 5, he stated:

> Though I cannot recall the specifics of the few minor ailments that I have had over the past ten years, they are reflected in the documents produced as Exhibit 7 to my Responses to Defendants' Request for Production and will be noted in medical records you obtain with the Medical Authorization have provided to you.

> In January of 2003, while in Mesa, Arizona, a driver ran a red light and as I went through the intersection on a green light, I t-boned the other driver's car.  I was not cited and was treated at the scene.  I did not receive subsequent medical treatment for the accident.

He made mention of no other accident, illness or injury.  He was then asked in Interrogatory No. 16 to state "the general condition of your health" during the last five years preceding the incident.  This interrogatory further required specific information "if your condition was other than normal in any particular period of time . . . ."  In response to this interrogatory, Curleyhair stated:

3

> I believe the general condition of my health preceding the crash was normal.  The few minor ailments that I did have are reflected in documents produced as Exhibit 7 to my responses to Defendant's request for production and will be noted in medical records you obtain . . . .

Based on these answers to interrogatories, one could reasonably assume that save for the January 2003 automobile accident that occurred in Mesa, Arizona, Curleyhair never had any significant accident, injury or illness.  Indeed, in his answer to Interrogatory No. 5, he states that he only had "a few minor ailments."  So, too, a reader of Curleyhair's answer to Interrogatory No. 16 could reasonably assume that Curleyhair has been healthy save for a "few minor ailments."

At Curleyhair's deposition, he was provided with the interrogatories and answers he previously gave and was afforded an opportunity to review them and to make corrections as necessary.  He made no corrections to these responses nor did he clarify, explain or modify any of his prior answers.  (Doc. 62, Ex. B, pp. 6-8).

## A.  Curleyhair's History of Accidents and Injuries

Defendants have since learned that Curleyhair's answers to interrogatories were false.  Contrary to the representation that he had only one prior accident, he has been involved in multiple accidents over the years and suffered numerous serious injuries.  (Doc. 62, Ex. C) Information obtained by Defendants shows the following:

(a)  Curleyhair was involved in a February 15, 1996 accident which occurred when he fell twenty to thirty feet into a ravine after having consumed both vodka and beer.  He struck his head, injuring his nose, face and jaw.  The accident resulted in emergency room

4

treatment for a broken or dislocated wrist, rib fractures, injury to his left arm, left shoulder, left knee, left thigh and right hand fingers.  He suffered abrasions, cuts and bruising and had marked swelling to his extremities.  He was prescribed painkillers and ultimately released in stable condition to his family.

(b)  Curleyhair was involved in a June 30, 1994 motorcycle accident.  He was found on the side of the road, apparently unconscious, by a passerby and was taken to a hospital emergency room.  He told the emergency room personnel that he skidded off the road at 30 miles per hour.  He complained of back and neck pain and had lacerations on the left side of his head.  He complained of neck, shoulder and arm pain, as well as lower leg pain.  He had a one and one-half inch laceration on his scalp and abrasions on his forehead.  An immobilization collar was placed on him and the doctor noted that he had "extensive abrasions entire [left] arm/forearm" as well as on his lower extremities.  During this hospital admission, he advised that he had previously broken his pelvis in 1990.

He was diagnosed as having suffered leg fractures, scalp lacerations, contusions and abrasions.  The medical record shows "ETOH intoxication[,] ETOH abuse."  Unlike his prior hospital visit, this visit to the emergency room resulted in a hospital admission, administration of various painkillers and further testing, and a referral for "ETOH" [alcohol abuse].

(c)  Curleyhair was involved in another automobile accident on January 1, 1981.  The hospital report states that "Mr. Curleyhair was involved in a motor vehicle accident yesterday [December 31, 1980] at Kayenta."  He was a passenger in an automobile and the vehicle

"sideswiped another vehicle." In the accident, Curleyhair hit the dashboard and broke his glasses. He complained of rib pain, pain on inhalation, back pain, pain in his hip and knee. He was diagnosed with left side soft tissue injury and back pain. Painkillers were prescribed and he left after an examination.

(d)  Curleyhair was involved in an October 4, 1986 rollover motor vehicle accident. He was brought to an emergency room by emergency medical technicians and had been immobilized and strapped to a backboard. At the hospital, he was intoxicated, disoriented and combative. He complained of "diffuse back pain." X-rays were taken, but no breaks or fractures were found. He did not want to stay at the hospital and was released to his family with instructions "to bring him back when sober."

(e)  Curleyhair was also involved in a December 14, 1985 motor vehicle accident which resulted in an emergency room visit. The medical records do not provide details on how the accident occurred, but at the emergency room, he complained of pain in both knees, had superficial abrasions which were cleaned and dressed. Painkillers were given and he was released from the emergency room.

(f)  Curleyhair was involved in yet another auto accident in October 1983. His medical chart shows that he complained of "chronic back pain" since an automobile accident three years before. He was undergoing physical therapy due to lumbar and lower thorasic pain extending to the sacroiliac area. The hospital notes state "connective tissue trauma[tized] in mva [motor vehicle accident]."

(g)  Curleyhair did not mention his July 1990 accident which resulted in the fracture of his pelvis, cervical paraspinal muscle strain, left arm thromophlebitis and right shoulder strain.  The record of that hospitalization states:

> Mr. Curleyhair is a 29 year old intoxicated male, not on any medications and without any past medical history except for a mode ankle fracture and a questionable history of penicillin allergy.  He also had a history of motor vehicle accident with back pain, with left sided soft tissue injury in 1988.  On the day of admission, he fell out of a tree when a branch broke and complained of neck, back and upper right thigh pain.  He admits to drinking but uncertain quantities and denies any tobacco abuse.  Patient was intoxicated at the time of admission and difficult to arouse, but became alert and oriented times three.

(h)  Curleyhair was also involved in another automobile accident on November 12, 2003, only one month before his deposition.  The accident occurred when he struck a cow elk with his vehicle on the highway.

During his deposition, defense counsel questioned Curleyhair about any prior accidents:

> QUESTION: Mr. Curleyhair, during the past 20 years, have you ever been involved in any other type of motor vehicle accidents, other than the present one of November of 2002 and the January 2003?
>
> ANSWER:   No, not that I know of.

(Doc. 62, Ex. B, Curleyhair Depo., p. 112, lines 13-18).

Defense counsel also sought information concerning Curleyhair's accident history related to alcohol:

> QUESTION: Do you recall any other accidents involving alcohol in the last 20 years?

7

ANSWER:    No.

(Doc. 62, Ex. D, Curleyhair Depo., p. 119, lines 15-17).

These answers were patently false.  Given the numerous serious accidents in which Curleyhair was involved, and all of the accidents involving alcohol which Defendants have now documented, it defies common sense and logic that Curleyhair did not know, forgot or could not recall these prior significant accidents.  These were not minor slip and falls.  To the contrary, any number of them could have caused catastrophic injury or death.  These are not the kinds of incidents that would slip one's mind.

## B.  Curleyhair's Driving Record

During his deposition, Curleyhair was also asked about his driving record.  He admitted having pled guilty to an offense while in high school, but when asked if he had ever been charged or pled guilty to DUI in the late 1980s, he answered "No, I don't think so." (Curleyhair Depo., p. 111, lines 9-11).

Defendants presented evidence demonstrating that on July 31, 1989,  Curleyhair was convicted of driving under the influence of alcohol and drugs.  This occurred following a guilty plea before Judge Paris Derizotis at a magistrate court in Gallup, New Mexico.

## C.  Curleyhair's Recitation of Medical History to Dr. Swajian

Curleyhair's lack of candor in the answers to interrogatories and deposition testimony was not limited to his misrepresentations in formal discovery.  Defendants submitted evidence which shows that the information he provided to his own physician, Dr. George Swajian, was inaccurate and misleading.

After the accident giving rise to this lawsuit, Curleyhair saw Dr. Swajian for complaints of pain in the cervical dorsal area, radiating to the mid-scapular area and to the mid-sternum. He explained to the doctor that his pain extended to both shoulders and upper extremities and to all fingers of both hands with paresthesia and weakness of grip in both hands. He complained of occipital and parietal headache with lightheadedness and nausea. Curleyhair complained of pain to his temporomandibular joint, hearing loss and tinnitus. He had pain in the lumbar and lumbosacral area, extending to the gluteal areas going down to his right ankle and right foot, as well as pain in the lateral aspects of his left foot and left knee.

In a letter prepared for the Plaintiff, Dr. Swajian states:

> Further questioning of the patient reveals no previous history of any injuries to the neck or back or any motor vehicle accidents prior to this accident. Evidently, he sustained a left wrist fracture in 1995 with surgery. This was uneventful and he has done very well with his wrist since that time. In 1972, he had an injury to his left AC joint. In 1997, he had a fracture of his left lower leg. There is no other history that I can elicit of any extremity injury. There is no other history of hospitalization or surgery. There is no history of serious illness, but the patient evidently is hypertensive but presently is on medication.

(Doc. 62, Ex. E, Dr. Swajian's Dec. 4, 2002 letter).

Given Curleyhair's claims to his own doctor of no history of accidents or injuries to his neck or back and no prior accidents, it would be understandable if Dr. Swajian attributes Curleyhair's condition to the freeway accident.[3]

---

[3]Dr. Swajian's December 4, 2002 letter makes no mention of whether, within a reasonable probability, Curleyhair's condition was proximately caused by the accident of Sept. 2002.

9

## D.  Monica Curleyhair's Medical History

Monica Curleyhair also answered various interrogatories served on her.   In Interrogatory No. 5, she was required to describe each and every accident, injury and illness sustained in the last ten years.  She responded, "I don [sic] specifically recall any accidents, injuries or illnesses in the past ten years, but have provided you with several Medical Authorizations so that you may obtain these records."  (Response to Interrogatory #5).  Thus, she made no mention of several prior hospital visits relating to migraine headaches.

When asked to describe the general condition of her health during the last five years, she stated, "I believe the general condition of my health preceding the crash was good." (Doc. 62, Ex. F, Response to Interrogatory #14).

At her December 15, 2003 deposition, she, too, was given an opportunity to modify any of her answers to interrogatories and she stated that she would make no changes.  (Doc. 62, Ex. G, Monica Curleyhair Depo., pp. 5-7).  During the course of her deposition, when defense counsel sought information on her claimed damages, the following interchange occurred.

> QUESTION: Can you describe for us, in detail, the medical problems that you have suffered because of the accident?
>
> ANSWER: Migraines, stress, pain. "Pain" meaning that--you know, being a healer, you know, you feel other people's pain and it comes into your body.  That was the pain that I was feeling from him, his pain.

(Doc. 62, Ex. G, Monica Curleyhair Depo., p. 39, lines 11-18).

* * *

QUESTION: So, the pain that you were experiencing was not physical pain to your body, it was more emotional pain or--

ANSWER:   Yes, more emotional pain for him.

(Doc. 62, Ex. G, Monica Curleyhair's Depo., p. 41, lines 9-12).

QUESTION: Okay. Let's focus on the migraine headaches that you spoke about. Have you ever sought medical attention for the headaches prior to the accident of September 13th of 2002?

ANSWER:   No. No, I don't--I have never gone there for migraines because--not until after, they had to give me a shot until after. I think it was the same day that he went in, I ended up with a shot too.

(Doc. 62, Ex. G, Monica Curleyhair Depo., p. 41, lines 13-21).

Based on this answer, one could reasonably assume that prior to the September 13, 2002 accident, Monica Curleyhair did not suffer migraines. She testified that she is a healer and "takes on" the pain of the person whom she seeks to heal. Thus, she claimed that she took on her husband's pain and developed her migraine headaches subsequent to her husband's accident.

Defendants obtained medical records that refute that answer. The records show that she went to the Ft. Defiance Hospital on January 1, 2001. This is nearly two years before the accident. Her complaint upon admission was "migraine headaches since yesterday. Had it off and on since last night. Seen 12-31-01 in ER. No improvement." During the course of her emergency room visit, she reported that her migraines had been "nearly constant except for some relief . . . for a few hours [since] yesterday." Her headaches had been

11

"continuous" despite taking Ibuprofen.  She further told the doctor "she does not usually get H/A, this is the worst that she's had."  (Doc. 62, Ex. H).

On December 31, 2001, again prior to the accident giving rise to this lawsuit, Monica Curleyhair went to the Indian Hospital complaining of posterior head pain--a migraine headache that had been constant for several days.  So, too, a prior medical report shows an emergency room visit on September 11, 1998 of frontal headache.  (Id.)

These records refute Monica Curleyhair's claims that she never suffered from migraine headaches until she "took on" her husband's accident pain.  The records also demonstrate that contrary to her sworn statements, she had indeed been treated at a hospital for migraine headaches before the accident.   Given the fact that there were several emergency room visits, and on some, she reported migraines that lasted for days, this is  not the kind of thing that someone would likely forget.

### E.  Monica Curleyhair's Testimony
### Re:  Curleyhair's Prior Medical History and Use of Alcohol

Defendants also raise concern over Monica Curleyhair's lack of truthfulness in two other matters.  Defendants questioned her about her husband's accidents involving alcohol.

> QUESTION: During the past, I guess since you have been married, the past twenty years, are you aware of any accidents that Robert has been in that have involved alcohol?

> ANSWER:   Since the time we were married?

> QUESTION: Yes ma'am.

> ANSWER:   None that I know of.

12

(Doc. 62, Ex. G, Monica Curleyhair Depo., p. 84, lines 15-21).

The hospital records belie her response.  Most of Curleyhair's numerous accidents involved alcohol.  On at least two occasions where Curleyhair was involved in accidental injuries involving alcohol, he was released to his family, or on other occasions he had been taken by the family to the hospital.  It strains credulity to believe that Monica Curleyhair would have been oblivious to these prior accidents which involved serious injury and were related to intoxication, alcohol abuse or the use of alcohol.  The only reasonable explanation is that she lied to bolster her and her husband's claims.

Given Curleyhair's numerous accidents relating to alcohol and the instances where family either took Curleyhair to the hospital or had Curleyhair released to the family, it is simply incredible that Monica Curleyhair was not aware of any accident involving her husband related to alcohol.

### F.  Monica Curleyhair's Damages Testimony

The final area raised by Defendants is Monica Curleyhair's damage testimony on the issue of loss of consortium.  She testified that she had a "good, really good" sexual relationship with her husband and had sex with him every night.  Following up on her response, defense counsel asked.

> QUESTION: [D]escribe for us, I guess, your sexual relationship throughout 2002.  Were you engaging in sex on a nightly basis prior to the accident?
>
> ANSWER:    I would say yes.
>
> QUESTION: Okay.  How long had the sexual relationship been at that level, how many years?

> ANSWER:   I would say it was always like that.  Well, yeah,
> all the way up from the time we got together as a
> couple, all the way probably to the accident.  I
> would say all the time.

(Doc. 62, Ex. G, Monica Curleyhair Depo., pp. 76-77).

When asked if there was ever a time during her married life that she had been unable to engage in sexual relations with her husband, Monica Curleyhair simply stated, "Just after I had my kids."

The impression given by Monica Curleyhair is that her sexual relationship with her husband was extraordinarily good and constant, and that save for the period following childbirth, she engaged in sexual relations with him every night.

Medical records located by Defendants contradict this sworn testimony.   An emergency room visit report of June 7, 2002, indicates that Monica Curleyhair had presented with abdominal pain which had persisted for a week.  She said that her pain had begun after having engaged in intercourse "for first time in long time."  Thus, Defendants assert that Monica Curleyhair has intentionally mislead them in an effort to pump up her claimed damages.  (Doc. 62, Ex. I).

The Plaintiffs argue that they did not deceive Defendants.  Rather, they provided the records they had, failed in their efforts to secure other medical records and that they freely provided medical releases.  They argue that it is ironic that the releases they signed authorized the release of records which Defendants now claim show misrepresentations.  They also argue that since the issue arose, they have supplemented their earlier responses, inferring that this now falls in the "no harm, no foul" area.  They also argue that Defendants'

counterclaims should be dismissed for discovery misconduct.[4]

## The Sanction of Dismissal for Discovery Violations

In <u>Chavez v. City of Albuquerque</u>, CIV 00-307 WJ/KBM, Judge Johnson dismissed a plaintiff's lawsuit when evidence was presented that the plaintiff testified at trial and admitted that he had lied in his deposition and discovery responses.  Memorandum Opinion and Order (D.N.M. Aug. 18, 2003 [Doc. 170]).  Judge Johnson concluded that "willful deceit . . . made a mockery of the judicial process."   <u>Id.</u> at 5 (*citing* <u>Chambers v. Nasco, Inc.</u>, 502 U.S. 32, 44, 111 S. Ct. 2122, 2132 (1991)(tampering with the administration of justice "is a wrong against the institutions set up to protect and safeguard the public," *quoting* <u>Hazel v. Atlas Glass Co. v. Hartford Empire Co.</u>, 322 U.S. 238, 246 (1944)); and *citing* <u>ABF Freight System, Inc. v. NLRB</u>, 510 U.S. 317, 326 (1994)("the gravest consequence of lying under oath is the affront to the law itself")).

So, too, in <u>Sandoval v. Martinez</u>, 109 N.M. 5, 10, 78 P.2d 1152, 1156 (Ct. App. 1989), Judge Harris Hartz, then a state appellate judge (and now a 10th Circuit appellate judge), affirmed dismissal of a case where a plaintiff lied in answers to interrogatories.

<u>Sandoval</u> is especially instructive.  There, Debra Sandoval sued for injuries to her neck, back and legs, allegedly suffered in an automobile accident.  During formal discovery, she was asked if she had ever been in a prior automobile accident and whether she had ever undergone surgery prior to the accident that gave rise to her lawsuit.  In her written response,

---

[4]The Court struck the Plaintiffs' motion to dismiss the counterclaim as it was improperly joined with the Plaintiffs' response to the Defendants' motion to dismiss (Doc. 89).  Such joinder is impermissible. (Admin. Order #92-88, May 4, 1992).  The Court allowed Plaintiffs ten days within which to file a new, but separate, motion to strike (Doc. 89, p. 2).

she wrote, "N/A" to these two questions, and during her deposition, she was asked if she had received any traffic citations during the preceding five hears. She responded to this question with a "no."

Defendants gave Sandoval an opportunity to supplement her interrogatory answers, but she made no changes. Thereafter, Sandoval signed a consent form authorizing defendants access to her medical records. When defendants obtained Sandoval's medical records, they learned that Sandoval had been in two separate automobile accidents which occurred more than ten years prior. One of the accidents resulted in Sandoval undergoing surgery.

Defense counsel then learned that contrary to Sandoval's representations concerning an absence of traffic citations, she had received two speeding tickets. Upon learning this information which contradicted Sandoval's sworn testimony, defendants moved for Rule 37 sanctions. The trial court determined that Sandoval failed to meet her discovery obligations and, in bad faith, had provided false answers. The trial court dismissed Sandoval's case as a sanction.

The New Mexico Court of Appeals considered whether Sandoval's lawsuit should have been dismissed for false answers during the course of discovery. In its analysis, the court referred to New Mexico's seminal discovery sanction case, United Nuclear Corp. v. General Atomic, Inc., 96 N.M. 155, 629 P.2d 231 (1980), *cert. denied*, 451 U.S. 901 (1981). In United Nuclear, the trial court entered a default judgment against a defendant as a discovery sanction. The defendant had not provided false answers to interrogatories, but

16

instead had resisted discovery, "stonewalled" and failed to provide requested information. The New Mexico Supreme Court affirmed the trial court's default judgment sanction, relying on several federal court cases, e.g., Evanson v. Union Oil Co. of California, 85 F.R.D. 274 (D. Minn. 1979); Hunter v. International Systems and Controls Corp., 56 F.R.D. 617 (W.D. Mo. 1972); and Life Music, Inc. v. Broadcast Music, Inc., 41 F.R.D. 16 (S.D. N.Y. 1966). Those federal court decisions authorize imposition of severe sanctions for discovery abuses.

The Sandoval appellate court noted that the prior United Nuclear decision involved obfuscation and refusal to provide information required by the discovery process. The defendants' failure to provide information was, in effect, no response to requested discovery. Thus, the situation in United Nuclear differed from the situation the Court of Appeals dealt with in Sandoval, where Sandoval provided false answers. Judge Hartz, writing for the court, nonetheless determined that Rule 37(d) applied to Sandoval's misconduct. He wrote:

> An interrogatory answer that falsely denies the existence of discoverable information is not exactly equivalent to no response. It is *worse* than no response. When there is no response to an interrogatory or the response is devoid of content, the party serving the interrogatory at least knows that it has not received an answer. It can move the court for an order to compel a response pursuant to Rule 1-037(A). If the response is false, however, the party serving the interrogatory may never learn that it has not really received the answer to the interrogatory. The obstruction to the discovery process is much graver when a party denies having had a prior accident than when the party refuses to respond to an interrogatory asking if there have been any prior accidents.

Sandoval, 109 N.M. at 8-9 (emphasis added).

The Court of Appeals then went on to determine the propriety of dismissal of Sandoval's case as opposed to a lesser sanction.  Adopting the Supreme Court analysis in United Nuclear, Judge Hartz wrote:

> [W]hen a party has displayed a willful, bad faith approach to discovery, it is not only proper, but imperative, that severe sanctions be imposed to preserve the integrity of the judicial process and the due process of other litigants.  United Nuclear Corp. v. General Atomic Co., 96 N.M. at 241, 629 P.2d at 317. District courts have a *duty* to enforce compliance with rules of discovery, and they should not shirk from imposition of the sanction of dismissal.

Sandoval, 109 N.M. at 9 (emphasis added).

The Court of Appeals noted that there is a judicial aversion to such a severe sanction as dismissal, as well as tendency on the part of a reviewing court with the benefit of hindsight, to be "heavily influenced" by the severity of outright dismissal as a sanction. Judge Hartz wrote of an appellate court's tendency to believe that a lesser sanction may resolve the problem.  He drew from Supreme Court language in National Hockey League v. Metropolitan Hockey Club, Inc., 427 U.S. 639, 642-43, *reh'g denied* 429 U.S. 874 (1976):

> There is a natural tendency on the part of reviewing courts, properly employing the benefit of hindsight, to be heavily influenced by the severity of outright dismissal as a sanction for failure to comply with a discovery order.  It is quite reasonable to conclude that a party who has been subjected to such an order will feel duly chastened, so that even though he succeeds in having the order reversed on appeal, he will nonetheless comply promptly with future discovery orders of the district court.
>
> But here, as in other areas of the law, the most severe in the spectrum of sanctions provided by statute or rule must be available to the district court in appropriate cases, not merely to penalize those whose conduct may be deemed to warrant such

a sanction, but to deter those who might be tempted to such conduct in the absence of such a deterrent.  If the decision of the Court of Appeals remained undisturbed in this case, it might well be that these respondents would faithfully comply with all future discovery orders entered by district court in this case. But other parties to other lawsuits would feel freer than we think Rule 37 contemplates they should feel to flout other discovery orders of other district courts.

The Court finds Judge Hartz' analysis persuasive.

The Curleyhairs' conduct in the case at bar is not unlike Sandoval's conduct.  Both Curleyhairs and Sandoval made a claim for physical injury to neck, back and extremities; both were asked about prior accidents and medical care; both denied prior accidents; both were asked about prior driving offenses; and both denied the prior offenses.  Both Sandoval and Curleyhairs were given an opportunity to correct and/or modify their prior interrogatories and both failed to clarify their prior answers.  Both Sandoval and Curleyhairs executed medical release forms, and the records obtained pursuant to the medical releases categorically refuted their prior statements.

This Court recognizes that asking a deponent to provide information of each injury or illness suffered the preceding five, ten or twenty years might be exceedingly difficult to answer, and if a deponent mistakenly omits information, it is understandable.  Thus, a court should proceed with extreme caution and circumspection when faced with a request for dismissal as a sanction.  However, it is not reasonable to believe that Curleyhair simply forgot about the multiple prior serious accidents and injuries he suffered.  Nor is it reasonable to believe that he somehow forgot that intoxication or alcohol abuse was related to the many prior accidents and injuries he suffered.

19

So, too, it is not reasonable to believe that Monica Curleyhair simply forgot, on several occasions prior to the accident involving her husband, that she did, indeed, suffer from migraine headaches. Nor is it reasonable to believe that Monica Curleyhair was totally unaware that her husband was ever in motor vehicle or other accidents involving the use or abuse of alcohol.

A trial should be a search for truth, and a party's intentional deception thwarts the truth-finding process. The answers given by both Curleyhair and his spouse are answers of convenience. A party may as easily misrepresent by omission as commission. Intentionally withholding information, perhaps with the hope that the correct information would not be discovered is as much an obstruction of the judicial process as direct and blatant untruths.

The pattern of deception in this case continues with Curleyhair's lack of candor with his own physician. Without information of multiple prior accidental injuries affecting Curleyhair's shoulder, neck, back, fingers, temporomandibular joint and sciatic nerve as reported in numerous prior medical reports, Dr. Swajian is compelled to conclude that whatever condition he diagnoses was likely attributable to the accidental injury which is the subject of this lawsuit.

The Curleyhairs respond that they did not misrepresent matters, and, in fact, signed releases authorizing Defendants to obtain information, indeed the very information that is now used to form the basis of the motion to dismiss. The Court is not impressed with this argument. Plaintiffs had no choice but to execute releases. They are making claims for physical, mental and emotional injury and, pursuant to the district's local rule, they are

compelled to provide that information.  D.N.M.LR-Civ. 26.3(d).  Moreover, providing a

medical release does not guarantee that it will find its way to a proper record custodian or

a private doctor who may have provided treatment to the Plaintiffs.  Finally, the Court notes

that in the <u>Sandoval</u> case, she, too, executed medical releases and the information obtained

by those releases confirmed Sandoval's prior deceptive answers.

      When confronted with their inaccuracies and untruths, Plaintiffs sought to remedy the

problem by supplementing their prior answers.  Even the supplemented answers are not in

conformity with the Federal Rules of Civil Procedure, as they are executed by counsel and

not sworn to by the Plaintiffs. Fed. R. Civ. P. 33(b).  The fact that Plaintiffs' misconduct was

discovered before trial does not resolve or absolve the initial deceptions.  Like the Court of

Appeals in <u>Sandoval</u> and Judge Johnson in <u>Chavez v. City of Albuquerque</u>, this Court views

the Plaintiffs' lack of candor and practice of deceit as unacceptable and sanctionable.

      A recommendation that a claim for damages be dismissed as a discovery sanction is

not easily made.  A court's determination of this nature should come only after careful and

deliberate consideration and thoughtful reflection.  Before determining that this most severe

of all sanctions is appropriate, a court must consider whether some penalty short of dismissal

should be imposed.  <u>Ehrenhaus v. Reynolds</u>, 965 F.2d 916, 920 (10th Cir. 1992); <u>Sandoval v.

Martinez</u>.

      In <u>Sandoval</u>, the court stated that if a violation of the discovery rules was for the

purpose of securing an advantage in just one aspect of a case, dismissal of that one issue

might be appropriate.  However, in <u>Sandoval</u>, Judge Hartz noted that the deception went to

the core issues of liability and damages.  So, too, here.

Finally, as observed by Judges Hartz and Johnson, the court's concern should extend beyond the immediate parties and should serve as a warning to others who may be tempted to play fast and loose with the facts.  Thus, after due consideration, the Court concludes that no penalty other than dismissal would serve the cause of justice and, therefore the referred magistrate judge recommends dismissal of the Plaintiffs' claims as a result of their misconduct.

### Recommendation

The Court recommends that Defendants' motion to dismiss [Doc. 62] be granted and that Plaintiffs' claims be dismissed with prejudice.

Lorenzo F. Garcia
Chief United States Magistrate Judge